Cox Padmore Skolnik & Shakarchy LLP
Steven D. Skolnik (SS-1121)
630 Third Avenue, 19th Floor
New York, NY 10017
Tel: (212) 953-6633
Fax: (212) 949-6943
*Attorneys for Plaintiff*



08 CV 1967

JUDGE BUCHWALD

RECEIVED
FEB 27 2008
U.S.D.C. S.D. N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**ECF CASE**

---------------------------------------x
GEORGE KARKANIAS,

              Plaintiff,

    v.

ALBERT EINSTEIN COLLEGE OF MEDICINE
OF YESHIVA UNIVERSITY; AND YESHIVA
UNIVERSITY,

              Defendants.
---------------------------------------x

CASE NUMBER:

COMPLAINT

    Plaintiff George Karkanias (hereinafter "Dr. Karkanias" or "Plaintiff"), states his complaint against defendant Albert Einstein College of Medicine of Yeshiva University (hereinafter, "AECOM") and defendant Yeshiva University (hereinafter "Yeshiva") (AECOM and Yeshiva being sometimes together referred to as the "Defendants"), as set forth hereinafter:

### PARTIES, JURISDICTION AND VENUE

1)    Plaintiff works in Manhattan and resides and is domiciled in the Bronx.

2)    Upon information and belief, defendant Yeshiva is a legally organized institution of higher education with campuses in Bronx and New York Counties, New York, and with a

principal place of business and residence in Bronx County, New York at 1165 Morris Park Avenue, Bronx, New York 10461. This Court has personal jurisdiction over Yeshiva.

3) Upon information and belief, AECOM is a legally organized not-for-profit entity that *inter alia*, operates a medical school and a hospital with a principal place of business and residence in Bronx County at 1300 Morris Park Avenue, Bronx, New York 10461. AECOM is one of Yeshiva's graduate learning, teaching and research institutions. This Court has personal jurisdiction over AECOM. Yeshiva and AECOM are related entities.

4) This Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. Sections 1331 and 1343(4), as well as 42 U.S.C. Section 2000-e 5(f)(3). This Court has supplemental jurisdiction over state and local law claims, pursuant to 29 U.S.C. Section 1367.

5) Venue is proper because the events giving rise to this action occurred within this jurisdiction.

## STATEMENT OF FACTS

6) Dr. Karkanias herein reasserts and incorporates by reference the allegations set forth in paragraphs 1 to 5.

7) Dr. Karkanias was at Yeshiva and AECOM for 18 years. Dr. Karkanias earned from Yeshiva and AECOM a masters of science, April 1991 (with honors) and a doctorate (Ph.D.), October 1993 (with honors).

8) Yeshiva and AECOM employed him. During his employment, Dr. Karkanias earned many professional recognitions and honors, culminating with a five year, million dollar grant award from the National Institute of Health ("N.I.H.") in 2004. Dr. Karkanias won the grant

at a time when most members of the department failed to obtain grants of comparable monetary value and prestige.

9) In addition, during his employment by Yeshiva and AECOM, Dr. Karkanias published more papers than his counterparts in the department, despite the fact that the Defendants calculated to provide him with less financial and manpower support than his colleagues. Specifically, he published approximately 55 works as of 2005.

10) Through 2005, Dr. Karkanias consistently published, as either senior author or coauthor, scientific articles on his research work that appear in highly-regarded biomedical and related journals, with high 'impact factor' ratings. Several of his scientific articles have been published in journals bearing very high 'impact factor' ratings, *e.g.*, NATURE MEDICINE, NATURE NEUROSCIENCE, DIABETES and JOURNAL OF NEUROSCIENCE.

## FIRST CAUSE OF ACTION: TITLE VII RETALIATION

11) Dr. Karkanias herein reasserts and incorporates by reference the allegations set forth in paragraphs 1 to 10.

12) Based on information and belief, in the wake of September 11, 2001, Yeshiva and AECOM faculty engaged in tacit religious intolerance of Muslim persons, and Yeshiva and AECOM turned an institutional blind eye to said intolerance. This behavior devolved into flagrant discrimination against persons whose Muslim religious identity and consciousness became known.

13) Dr. Karkanias opposed and continues to oppose any and all religious and national origin discrimination.

14) Beginning in late 2002, Dr. Karkanias openly voiced his concern about anti-Muslim animus and discrimination by Yeshiva and AECOM minority affairs director and faculty

3

member Anne Etgen, Ph.D ("Dr. Etgen"). Dr. Karkanias conferred with faculty with the goal of gathering testimonial evidence to corroborate the discrimination complaints by a Muslim doctoral candidate. Dr. Karkanias met with AECOM officials in his effort to encourage Defendants to commence an investigation. Specifically, in late 2002/early 2003, Dr. Karkanias voiced his complaints to the Chairman of the Neuroscience Department Dr. Faber and to Dr. Todd R. Evans, who is Assistant Dean for Graduate Studies. During a telephone call to Dr. Evans, Dr. Karkanias expressed his "firm belief" that the Muslim person was being mistreated and discriminated against by Dr. Etgen due to her distaste for Islamic religious beliefs and her gender issues with men in general and Muslim men in particular. Thereafter, in 2003, 2004 and 2005, Dr. Karkanias informed numerous colleagues, such as Dr. Ilona Vathy, and senior officials, of his belief that Dr. Etgen and other senior faculty, such as Dr. Faber and Dr. David, had retaliated against Dr. Karkanias (and the Muslim person).

15)   In October 2003, a top AECOM official gave departmental approval of Dr. Karkanias's grant application to conduct scientific research at AECOM through May 30, 2009. The application's supporting documents specified the extent of facilities and other resources that the department was committed to provide to Dr. Karkanias for his project.

16)   Dr. Karkanias memorialized his Title VII related concerns in a letter dated June 7, 2004, which provided Yeshiva and AECOM written notice of his claims of religious and "gender" discrimination and retaliation.

17)   Yeshiva's and AECOM's handbook policy and procedures provide that departmental "approval" of a proposed grant application involves a determination and indication that AECOM is committed to providing "appropriate space and facilities" so as to enable the

4

grant applicant "to perform the proposed research" (hereinafter, "Facility Commitment Handbook Policy"). Thus, when medical college Dean Purpura approved Dr. Karkanias's October 2003 N.I.H. grant application, Yeshiva and AECOM committed Yeshiva and AECOM to provide facilities and space to Dr. Karkanias through May 30, 2009.

18) In December 2003, Dr. Karkanias assisted the Muslim doctoral candidate in successfully defending his doctoral thesis, despite the objections of AECOM authorities who discouraged Dr. Karkanias from sitting on the thesis defense committee. The Muslim person was awarded a doctorate. Thereafter, Yeshiva and AECOM ruthlessly commenced efforts to evict Dr. Karkanias from Dr. Etgen's laboratory, to reassign the space to a woman, to professionally ostracize him and ultimately to terminate his employment, despite the terms of the Facility Commitment Handbook Policy.

19) In a letter dated October 27, 2004, AECOM gave Dr. Karkanias a two-year term appointment (until October 2006). Yeshiva and AECOM violated their termination policy when they evicted Dr. Karkanias from the premises in May 2005, and prematurely terminated his appointment.

20) When the Muslim doctoral candidate's AECOM identification card (hereinafter, "ID") reached its expiration date, AECOM management ignored requests for a new one. Under the handbook policy, Dr. Karkanias had authority to request issuance of an ID to this individual. In 2005, after the Muslim individual obtained his Ph.D., Dr. Karkanias wrote to the security department to request that it re-issue the Muslim person's ID.

21) Dr. Karkanias requested the ID for said Muslim person in an effort to oppose what he perceived as management's anti-Muslim animus.

22) Management refused Dr. Karkanias' request for an ID. Management took an adverse employment actions against Dr. Karkanias because he requested an ID on behalf of the Muslim scientist. The adverse employment actions included, but were not limited to, (a) criticisms lodged against Dr. Karkanias during his performance evaluation, and (b) employment discharge.

23) In addition, Yeshiva and AECOM took steps to frustrate and to hinder Dr. Karkanias's grant opportunity with the N.I.H. The Respondents unreasonably delayed action with respect to Dr. Karkanias's N.I.H. grant.

24) Yeshiva and AECOM withheld and omitted Dr. Karkanias' name from lists of eligible scientists for grants.

25) In 2005, Yeshiva and AECOM discharged Dr. Karkanias from employment for reasons having to do with his efforts to oppose discrimination against a Muslim person.

26) On March 22, 2005, the undisputed date of Dr. Karkanias's performance evaluation, Respondents' Department of Pathology Chairman Michael Prystowsky informed Dr. Karkanias that "the only major problem was [his] . . . intervening on behalf of someone who is leaving." The Muslim post-doctoral employee was the "someone" to whom Dr. Prystowsky made reference.

27) A few days before Dr. Karkanias received his performance evaluation, an AECOM official (Dr. Manna) urged him "not to associate with this guy," referring to the Muslim Ph.D.

28) On April 22, 2005, Chairman Prystowsky informed Dr. Karkanias that "it would be better if you moved on."

29) Dr. Karkanias was discharged from employment.

6

30) Dr. Karkanias was discharged from employment, despite the fact that he had been given no prior warnings.

31) The employment discharge was in violation of the Defendants' respective policies guaranteeing progressive discipline.

32) In 2005 and thereafter, Yeshiva and AECOM dissuaded third parties from either hiring Dr. Karkanias or engaging in business relations with him. In Spring 2005, AECOM dissuaded non-party The State University of New York ("SUNY") from entering into a leasehold contract with Alison Pharmaceuticals ("AP"), a company with which Dr. Karkanias had a business affiliation. AP had attempted to lease laboratory and office space from SUNY. Based on information and belief, AECOM contacted SUNY, and cautioned it not to enter into a leasehold agreement with AP due to Dr. Karkanias' affiliation with AP. SUNY backed away from the imminent leasehold agreement.

33) By their acts and omissions, Yeshiva and AECOM interfered in and hindered Dr. Karkanias' business relationship with AP. They also compromised his professional relationship with former Yeshiva and AECOM colleague Dr. Peter Werner, with whom AP had an association during all times relevant to this action.

34) As a result of Yeshiva and AECOM's acts and omissions, Dr. Karkanias has suffered and continued to suffer monetary and non-monetary losses. Also, Dr. Karkanias has suffered limited professional advancement, interference with his scientific projects, humiliation, as well as pecuniary losses.

35) In December 2005, Dr. Karkanias filed a "continuing action" charge of discrimination and retaliation against named respondent Yeshiva and AECOM; namely, *Dr. George Karkanias adv. Albert Einstein College of Medicine; Yeshiva University*, EEOC

*Charge No. 520-2006-00081.* The charge was filed with the Equal Employment Opportunity Commission ("EEOC").

36) The EEOC issued a determination dated September 20, 2007. The determination jointly refers to Yeshiva and AECOM as "Respondent."

37) The EEOC determination held, *inter alia,* as follows: "Based on the evidence reviewed during the course of this investigation, it is more likely than not that Respondent engaged in retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended." The EEOC also found that the Respondent "negatively interfered with [Dr. Karkanias'] professional dealings in connection with future employers and/or other institutions for having complained of religious and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended." The EEOC also found as follows: "The record further shows that Respondent failed to provide a prompt and/or an effective remedy after Charging Party engaged in a protective activity in having opposed employment discrimination covered under Title VII of the Civil Rights Act of 1964, as amended."

38) On December 1, 2007, Dr. Karkanias received a right to sue notice from the EEOC, which notice was dated November 28, 2007.

39) Yeshiva and AECOM violated Dr. Karkanias' civil rights under Title VII, 42 U.S.C. §2000-e 3(a), which prohibits retaliation against an individual who engages in Title VII protected activities.

40) This action is commenced within 90 days following Plaintiff's receipt of the right to sue notice from the EEOC.

## SECOND CAUSE OF ACTION:
## NEW YORK STATE HUMAN RIGHTS LAWS

41)   Dr. Karkanias herein repeats, reasserts as if set forth fully herein, and incorporates by reference the allegations of paragraphs 1 to 40.

42)   For the reasons set forth in support of the Title VII claim, Yeshiva and AECOM jointly and severally violated Dr. Karkanias' human rights under New York State Executive Laws § 296 *et seq.* Said body of law prohibits, *inter alia,* retaliation against persons who engage in protected activities under said statute.

## THIRD CAUSE OF ACTION:
## NEW YORK CITY HUMAN RIGHTS LAWS

43)   Dr. Karkanias herein repeats, reasserts as if set forth fully herein, and incorporates by reference the allegations of paragraphs 1 to 42.

44)   For the reasons set forth in support of the Title VII claim and New York State Human Rights Laws, Yeshiva and AECOM are jointly and severally are liable to Dr. Karkanias for violating his human rights under N.Y.C. Admin. Code §8-107 *et seq.,* which prohibits, *inter alia*, retaliation against persons who engage in protected activities under said statute.

45)   Plaintiff has mailed a copy of the instant complaint to the New York City Commission of Human Rights and to the Office of the Corporation Counsel of the City of New York, thereby satisfying the statutory notice requirements under N.Y.C. Admin. Code § 8-502.

## FOURTH CAUSE OF ACTION:
## NEW YORK STATE LABOR LAWS

### Claim for Accrued, Unused Vacation Benefits

46)   Dr. Karkanias repeats, reasserts as if fully set forth herein, and incorporates by reference paragraphs 1 to 45.

47) Dr. Karkanias was employed within the meaning of New York Labor Law ("N.Y. Labor L.") §§ 2 and 651.

48) Yeshiva and AECOM jointly and severally were Dr. Karkanias' employer, pursuant to N.Y. Labor L. §§ 2(6), 190(3) and 651(6).

49) Dr. Karkanias was entitled to paid vacation days as part of his compensation package from AECOM.

50) The employee handbook provides, in relevant part as follows: "Fulltime and part-time faculty are allowed one month of paid vacation each full academic year of service, prorated for part-time faculty. Vacation may be requested by the faculty member, at his convenience, as long as in the judgment of the chairperson, it is consistent with the operating responsibilities of the department. All vacation entitlement must be used within each academic year and cannot be extended to a subsequent academic year without the written authorization of the appropriate Associate Dean."

51) Academic year 2004-2005 spanned the period August 1, 2004 to July 31, 2005. In that academic year, Dr. Karkanias accrued approximately four weeks of vacation time. His biweekly salary was approximately $3,125.00.

52) In 2005, Yeshiva and AECOM fired Dr. Karkanias.

53) At the time of his job termination from AECOM, Dr. Karkanias used only one week of vacation time, and had a balance of three weeks of accrued, unused vacation time. He is owed the amount of $4,687.50 for said vacation time, which monies AECOM has yet to remit.

54) 2004 and 2005 accrued, unused vacation pay is a vested benefit, pursuant to Yeshiva and AECOM's policies and practices.

55) To date, Yeshiva and AECOM have omitted to remit to Dr. Karkanias payment for the value of his vested vacation pay benefits.

56) Yeshiva and AECOM jointly and severally are liable to Dr. Karkanias for the vested unpaid vacation benefits plus an amount of liquidated damages that equals 25% of said unpaid vacation benefits, together with prejudgment interest, pursuant to the New York Labor Laws and applicable regulations governing the right to vacation benefits.

### FIFTH CAUSE OF ACTION:
### BREACH OF CONTRACT

57) Dr. Karkanias repeats, reasserts as if fully set forth herein, and incorporates by reference paragraphs 1 to 56.

58) In December 2003, Dr. Karkanias assisted a Muslim person in successfully defending his doctoral thesis, despite the objections of AECOM authorities who discouraged Dr. Karkanias from sitting on the thesis defense committee. The Muslim person was awarded a doctorate. Thereafter, Yeshiva and AECOM ruthlessly commenced efforts to evict Dr. Karkanias from Dr. Etgen's laboratory, to reassign the space to a woman, to professionally ostracize him and ultimately to terminate his employment, despite the terms of the Facility Commitment Handbook Policy.

59) In a letter dated October 27, 2004, AECOM gave Dr. Karkanias a two-year term appointment (until October 2006). The two-year appointment was contractual in nature, and subject to the handbook rules. The appointment should have lasted the full two years, because, under the handbook policy, "all faculty appointments shall state the term of the appointment" and a "term appointment shall cease automatically at the end of their specified term." Yeshiva and AECOM violated this termination policy when they evicted Dr. Karkanias from the premises in May 2005, and prematurely terminated his appointment.

60) The faculty handbook mandates identification cards for all employees, including but not limited to, postdoctoral fellows. Yet Yeshiva and AECOM issued no employee identification card for a particular Muslim person. In 2005, Dr. Karkanias wrote to the security department to request that it re-issue the ID of said Muslim person. Dr. Karkanias was authorized under the faculty/employee handbook to make such a request. Management refused Dr. Karkanias' request, despite the provisions of the handbook policy.

61) Yeshiva and AECOM have respective policies guaranteeing progressive discipline.

62) In 2005, Yeshiva and AECOM discharged Dr. Karkanias from employment. Dr. Karkanias was discharged from employment, despite the fact that he had been given no prior warnings.

63) Yeshiva and AECOM's employee/faculty handbook is intended by said institutions to create rights and obligations between said institutions and their employees.

64) By their acts and omissions, Yeshiva and AECOM jointly and severely breached their contract with Dr. Karkanias.

65) Yeshiva and AECOM jointly and severally are liable to Dr. Karkanias for breach of contract, pursuant to state law.

### SIXTH CAUSE OF ACTION:
### INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

66) Dr. Karkanias repeats, realleges as if set forth fully herein, and incorporates by reference the allegations set forth in paragraphs 1 through 65.

67) As pled in support of plaintiff's Title VII retaliation claim, Yeshiva and AECOM took steps to frustrate and to hinder Dr. Karkanias' grant opportunity with the N.I.H. For example, Yeshiva and AECOM unreasonably delayed action with respect to Dr. Karkanias's

N.I.H. grant. In addition, Yeshiva and AECOM withheld and omitted Dr. Karkanias' name from lists of eligible scientists.

68) As pled in support of plaintiff's Title VII retaliation claim, Yeshiva and AECOM interfered in and hindered Dr. Karkanias' business relationship with AP, an entity in which Dr. Karkanias had a substantial ownership and business interest. In addition, Yeshiva and AECOM compromised Dr. Karkanias' professional relationship with Yeshiva and AECOM faculty member Dr. Peter Werner, who maintained a business association with AP during all times relevant to this action.

69) Yeshiva and AECOM's acts and omissions were malicious, and served no legitimate business purpose. Yeshiva and AECOM's acts and omissions were intended to tortiously compromise Dr. Karkanias' business relationship and professional reputation with N.I.H., AP and Dr. Werner.

70) Dr. Karkanias has been damaged and suffered injury and continues to suffer damages and injury as a result of Yeshiva and AECOM's acts and omissions.

71) Yeshiva and AECOM are jointly and severally liable to Dr. Karkanias for intentional interference with business relations.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a TRIAL BY JURY;

AND WHEREFORE, Plaintiff seeks relief against Defendants in the following form and to the following extent:

a) actual damages in an amount to be determined at trial;

b) compensatory damages in an amount to be determined at trial;

c) punitive damages in an amount to be determined at trial;

d)   unpaid vacation days (three weeks);

e)   liquidated damages pursuant to the New York State Labor Laws;

f)   equitable accounting;

g)   job reinstatement;

h)   court-supervised anti-discrimination and anti-retaliation remedial training for Yeshiva and AECOM's Chairman of the Department of Neuroscience Dr. Don Faber, Chairman of the Department of Pathology Dr. Michael Prystowsky, Associate Dean of Students Dr. James David, M.D., defendant Dr. Mehler and defendant Dr. Etgen;

i)   reasonable attorney fees as provided by statute and/or law;

j)   prejudgment interest;

k)   costs and disbursements; and

l)   such other and further legal and equitable relief as the court deems just and proper.

DATED:   New York, New York
         February 27, 2008

         COX PADMORE SKOLNIK & SHAKARCHY LLP
         Attorneys for George Karkanias

         By: Steven D. Skolnik, P.C.
         Steven D. Skolnik, Esq. (SS-1121)
         630 Third Avenue, 19th Floor
         New York, NY 10017
         (212)953-6633